Good morning. May it please the court, Michael Tanaka, Deputy Federal Public Defender, appearing on behalf of Mr. Hernandez. Excuse me. I'd like to reserve a couple minutes for a moment if I might. This is really, from our point of view, a very simple case, notwithstanding the government's clause. It's governed by well-settled principles of law that control every aspect of this case. There's no question but that the police illegally seized, detained, and searched Mr. Hernandez on that night. The district court gave two reasons for justifying the search. Neither one of them is sufficient. First, the district court found that there was a reasonable suspicion that Mr. Hernandez was engaged in criminal activity. That's totally unsupported by the record. As the court knows, he was sitting on the bus minding his own business. Two people got on, had some altercation with him. The bus driver was concerned, brought Mr. Hernandez to the front, called it in. The police said they'd meet him there. The police got there. The bus driver points out Mr. Hernandez as the victim. The police pull him off, knowing only that his status as an ordinary citizen, a possible victim on the fence. Well, it wasn't quite clear at that point. I mean, I think the bus driver said that he heard Parker say, the first police officer say, well, there was an incident involving three people. And it wasn't initially apparent, I think, that he was the victim. I mean, it wasn't clear. Later on it was. Because didn't the second officer come over and say, he's the victim? He did, and Sheriff Deputy Parker said, yeah, I think so. Signifying that he knew that before. Plus, there's just a lot of evidence showing that he knew he was the victim at the time he pulled him off the bus. First initial report was two men assaulting a third man. Well, it was obviously that this was the third person. The bus driver himself said that he told Deputy Parker that this was the victim. And he only spoke to Deputy Parker once. That was before he took him off the bus. That said ER 75 and 86. Then, as Your Honor points out, when Deputy Mueller came over and said, that's the victim, and Deputy Parker said, I think so. Again, signifying that he already knew that that was the victim. Probably because, as the bus driver testified under oath, he had told him that he was the victim. Let's assume, hypothetically, this is a bar fight and you get two guys and this other fellow involved in a fight. Police come. What are they entitled, do you think, under Terry, to do at that point, if they haven't, assuming for the sake of argument, that they haven't identified who's the victim and who's the perpetrator? If they don't know and they can equally assume that they're both culpable, then under Terry there's probably reasonable suspicion that both of them or either one of them might be involved in some sort of activity. If it's the fact of the person's a victim, in your view, isn't known, then under Terry the search is okay. As long as there's something else pointing that there's a suspicion. All right, so he's got shifty eyes, he's looking nervous, he's not answering questions. No, but there has to be something in the initial report that there's criminal activity involving the person that they detained. Right. All you have is a fight and you don't know who is the victim, who's the perpetrator. Your view is under Terry you can question and possibly pat down if you haven't identified. I'm just trying to figure out what's okay. Obviously it would depend on the facts. What kind of fight, were there weapons involved, was anyone hurt, was it verbal, was it physical? All those things would determine or bear on what the police could do in investigating that. But the facts here are all we know. The only reason the police are there is because the bus driver told them or the bus driver dispatcher called it in. It was a verbal altercation. Two men were threatening a third man. Here's the third man. He's nothing. He doesn't lose any rights by being the victim of an altercation. And that's exactly what happened here. He was pulled off the bus and treated like a criminal. That's my question. Does your case turn on the fact that was he, the fact that he was a victim was communicated to the officers at the time? Yes, that's certainly a big part of it. Was there any physical altercation? That's unclear, though there's some evidence that there might have been a bruise on Mr. and Mrs. Case. There was some indication that he knew these people, right? The bus driver surmised that. Something about they were going to school together or something. Right. That was their explanation of the bus drivers, why they were doing it. They were horsing around because they knew each other. But the point being that if there was... So there could have been more history to all this than whatever happened on this bus. Pardon? There could have been more history to all this than whatever happened on this bus in terms of who was the victim and who wasn't the victim. I'm sorry. All I'm saying is that the bus driver saw a little piece of whatever was going on here. That's right. And did the police have to agree that he accurately understood what was going on there or could they investigate similarly to the boss fight, everybody involved to see who was doing what to whom? They certainly had a right to try to investigate. But based on what the bus driver told them, which was the sole basis for any investigation, it's nothing they saw, it's nothing anyone else reported, it's the sole basis of what their sole justification for acting is what the bus driver told them. Now, nothing in what the bus driver told them gave them cause to further detain Mr. Nance. Certainly they could have detained those two others. No question about that. They didn't even take the others off the bus. No, they didn't. They went right to the identified victim. Right. That seemed a little odd to me because then I watched the video. Did the district court watch the video? Yes. Okay. And it seemed a little odd that they pulled the victim off and started interrogating him. And while they were doing that, the two people who the bus driver identified as the perpetrators snuck off and left. That's very funny. It's kind of like the worst police job I've ever seen. I suspect it. If Mr. Hernandez were, you know, maybe a middle-class older person, he may have been treated a little differently by the police in that respect after receiving a report that they'd been the victim on multiplication. The only possible explanation is that he was up front. He was the one who was closest to them. Right, because the bus driver wanted to protect him as the victim. So if the bus driver said there's an altercation, there's three people, and they take the victim off to protect him, I don't understand why the police didn't go back onto the bus to get the alleged perpetrators right away, or at least one of them. There's absolutely no concern about the alleged perpetrators. When Deputy Parker watched the video, I was informed that they got away. Really? I mean, you didn't ask, I guess, or whoever was doing the suppression hearing, never really asked the police why they behaved the way they did. I mean, I had this feeling there's some back story here, like they knew this guy, they knew something, they had some reason to think he was the problem or something. I don't know. It was just really odd. It is odd. Looking at the video, my suspicion is that they just didn't like the way he looked. He looked like a troublemaker to them, but we don't know. And this case does depend a bit on him being only the victim, but I would note further that the court, the district court, found that the bus driver was told he was the victim. And I would note that the court found that the district court found that the bus driver   was the victim. And I would note that. And that's what you know from the video. You totally stayed away from the government's main arguments, and there may be good reason for that, but the fact that he was a parolee and had to go ahead. Their main argument seemed to be he was a parolee and he has no Fourth Amendment rights. And you're staying away from that argument. I just haven't gotten to it. Oh, I see. I'm perfectly happy to address that. I think that's simply addressed. One, Caceres, this Court's case in Caceres, is totally on point and controls that. The government has cited not a single case where a parole search is justified where the people doing the search or the detention or the seizure didn't know the person was subject to that condition. And there's a very good reason there are no cases for that. Because that's the sin non quo of being able to search. You have to know that the person is subject to a search condition. The basic Fourth Amendment principles say that you judge the police's action based on what they knew at the time of the action. Here they did not know he was on parole. They did not know he was on probation. They did not know he was subject to a search condition. They may have suspected it, but they didn't know at any time before they searched him or detained him. Under Caceres, that's the end of the issue. That's totally on point and controls this case. Even beyond that, Caceres is absolutely right under, as we pointed out in our brief, under the general Fourth Amendment analysis in either Sampson or anything where you test the reasonableness of the police action against the State's interest. California law, which has imposed the current condition, says that any search report based on a condition that the police don't know about it is per se unreasonable. And California law also says that California has no interest in monitoring probationers where the police don't know about the fact of probation when they take their action. So under either prong, it can't be justified as reasonable, and that's exactly what this Court said in Caceres. Do you want to reserve some time? Yes. Very good. From the United States. Mr. Honors, good morning or good afternoon. Rob Keenan for the government. I wanted to start where Mr. Tanaka did, addressing the grounds upon which the district court ruled. And then I'll get to my favorite argument, which is the consent waiver and the lack of standing arguments. I did want to address a couple of questions that were put to Mr. Tanaka. Mr. Tanaka had the quote partially right. When Deputy Mueller on the dash cam video says, my understanding is he's our victim, referring to the defendant, Deputy Parker said, yeah, I think so, as Mr. Tanaka mentioned. But he continued, and he said, I'm not sure. That wasn't a scripted piece of testimony. It was something said off the cuff on a dash cam video. Deputy Parker in his testimony. Did he have any basis for not being sure? He has to have a reasonable suspicion. Yes. He explains in his declaration and in his testimony, in his testimony's response to questions just basically saying that he's trying to figure out what the facts are. At the moment he arrives, he's the only officer on scene, by the way, during the first three minutes or so. Actually, three minutes captured on the video. There's some additional time on the bus where he's the only officer on scene. And he explains he's trying to figure out what happened. A fight typically takes two to tango. Not always. Sometimes it's just an assault. But the bus driver described it as a fight, not an assault. What was the call? When the bus driver called, what did the bus driver say? He was called as a witness. No. When he called to report the problem. There is no recording, to my recollection, of his statement to the bus dispatcher, but the bus dispatcher reported to the deputies, both Deputy Miller and Parker heard it over the dispatch radio, that it was a verbal fight involving death threats. Serious stuff. Serious enough, the bus driver testified to take the unusual step to pull the bus over, a crowded bus, 40 to 60 people he estimated were on board heading home. And he pulled the bus over and waited for police to arrive. So it was a serious enough altercation, in his mind, justifying police contacting the police. There was not a bruise, by the way, on Mr. Hernandez's face described as a red mark. So there was some physical evidence observed by Deputy Parker that there was some sort of a fight. It wasn't a mistaken thing. And the bus driver testified that he wasn't certain that he was getting the right story when the two other subjects told him that they were just horsing around in no definite. But he was quite clear in his testimony and apparently in what he told the police that Hernandez was the victim. The district court found that the bus driver did tell the deputies that in his view, the bus driver's view, Mr. Hernandez was the victim. What articulable facts are there, objective facts, that the police officers could cite that he was not the victim, he was the perpetrator? Well, first I would submit they don't need to make that finding. A Terry stop is an investigative tool. So they're not fact finders at that point. That's a different question. I know. Okay. They have to have reasonable suspicion to detain him and to search him. They absolutely do. Okay. So what was the reasonable suspicion? They had a number of facts. It started with the dispatch call that I just described, a verbal fight on the bus, not an assault but a fight. A verbal fight involving death threats. When they arrived, they talked, Deputy Parker initially talked with the bus driver. There's no recording of what exactly he said, but there was an indication, a physical mark on Mr. Hernandez's face. Some sort of a fight occurred because he suffered some sort of a mark as a result of it. It shows that he suffered some kind of a hit. There's no, but is there that he hit back or that he had been the perpetrator when the perpetrator was described as two people? I think the important thing here is the investigation was truncated very quickly by Mr. Hernandez not wanting to initially even provide his identification. He did give his identification, and not all victims of crime want to report it. After about three or four requests, I think, he did provide identification. And the, but the police officers are provided or responded. This is not a typical tarry stop where they spot some suspicious character walking down the street and decide to make a U-turn and check it out. They were responding to a particular call about an altercation on board the bus. The problem here, and it's fairly fine cut, is yes, there was crime afoot. The question is who was doing the crime? Where, what was their evidence that this guy was responsible for any crime? Well, the Declaration of Deputy Parker talks about the types of issues that he wants to look into when he, basically it's the report of a fight. And some physical evidence that a fight occurred. I think in all fairness. He's trying to figure it out. Well, he goes through that. But I think in all honesty, if you look at this record, there's really no indication anywhere that he was the perpetrator. So he goes on the bus, and I can understand why the officer wanted to talk to him first. He wanted to find out what happened. But then he became focused on what happened. There's, I don't think there's much dispute he was the victim. There might have been some, you know, but there's nothing, there's nothing in the record that says he's the perpetrator. So he focuses on him. And then the other two guys just walk off the bus, unfortunately. So the question is, given all that, what, if you're interviewing the victim, let's just assume hypothetically he knows he's the victim. You're interviewing the victim. What gives you the right to then search him? Well, I mean, and I'm not saying you don't have a right. I'm just saying let's take the worst case scenario for you, which is they know he's the victim. They're interviewing him to find out what happens. And they decided, well, okay, let's just go ahead and frisk him. Well, there's a lot that goes on in those three minutes or so between the time when he finally gets the identification and asks a couple of questions about his address. But he very, I have a related question, which is he very rapidly, I don't remember how rapidly, when he starts saying, can't I go? And he says, no, you can't. Right. So the question is, a related question is, if you're interviewing somebody that you think is the victim, who says, I want to go, can you tell him, no, you have to stay here? The answer is yes. We cite to a couple of cases. This case doesn't turn on whether he's a victim or a suspect. I'm sorry. It doesn't turn on whether or not he was a victim or a suspect. The fact that the deputy is testifying, it's not controverted. They didn't know what happened in the fight. They really, the investigation -- But Judge Thomas asked you to start with the proposition that they, or at least to show us what evidence. They had several indications that he was the victim and none, any that he wasn't. Yeah. And I understand you have a factual disagreement with it. But I'm just analytically, there are many different threads. Just start off with the idea that they know he's a victim. Run me through your analysis of the facts and why he had enough suspicion to conduct a stop and frisk under Terry. Deputy Parker testified about a number of things that sent up red flags, about just his three or four minutes of an encounter with Mr. Hernandez. He was evasive when asked simply for his identification. He was, he reputedly, I'm sorry, repeatedly refused to say whether he'd ever been arrested before, which was some sort of foundational question about whether he was on parole. Well, did they have any, let's suppose he was only a victim. And let's suppose that he gave his I.D. and then said, I want to go home. Do they have any right to keep him there and find out whether he had been arrested? The, there, neither party cites a case on that point, and I'm not aware of any. That answers that question. But I have seen in the past cases involving traffic stops where criminal checks are conducted, and that's considered to be reasonable. But in that instance, you have some suspicion that this person did something, right? A traffic violation. That's why you stopped them. A traffic violation. Right. But here there was no, what was the suspicion that he had done anything to violate the law? I don't know that the, the record, the difficulty with the record, and I don't think it redounds to the detriment of the government's argument ultimately, shouldn't, in other words, because the investigation was simply truncated. It was interfered with. Well, was it really? I mean, he says in his declaration all the stuff he wants to know, and you alluded to it earlier in your argument. Here are things combined. Who was involved? What are their names, contact information, background? Who initiated the physical contact? It goes on and on. He didn't ask any of those questions. He asked them, give me your I.D. If you don't give me your I.D., you're going in the car. Are you, have you been arrested? Incorrect. Incorrect. The testimony and his declaration establish that there was a question put to Mr. Hernandez. Do you want to tell me what's going on? What's going on? It's a general question, but it opens it up. You know, he doesn't want to. He certainly doesn't go through the checklist of all the things in his declaration of what he really wants to find out. He said, what's going on? Let me see your I.D. Then his voice gets louder, and he said, I want to leave. I don't want any trouble. I want to go home. Give me your I.D. You're going to go back to the car. The deputy testified in his statements to Mr. Hernandez outside the bus, made clear. He's trying to make sure he has time to get back to the other two subjects to talk with them and also the other witnesses on the bus. There were a number of people to talk to in order to do a competent investigation. We simply never got there because the deputies never got there. Because they never got there because they arrested Hernandez, and the guys who were beating him up walked away. Ultimately. I mean, it's. The court asked a question of Mr. Tanaka about why was he taken off the bus first. I think the answer is officer safety. He was the only, Deputy Parker was the only officer on scene on the bus. Or is it that he was pointed out to be the victim, so they took him off the bus? That might be. But having two subjects against one deputy is a troublesome situation. He was waiting, essentially, for deputy. So he just left them on the bus, these two people who had been assaulting this other person, with all the other innocent people sitting around the bus? Well, the radio dispatchers made clear who was responding. There was another deputy in response. And actually, if you look at the video, I know you have, the two other subjects scamper off the bus and run off screen, just, you know, some, I think it's maybe 20, 30 seconds before Deputy Mueller arrives. Here's another question. Suppose that, my understanding is that they asked for the I.D., he gave them some I.D. eventually. I mean, not that eventually. Within 48 seconds. And then they start asking about his arrest record, and he doesn't answer. What gives him the right to then arrest the guy for not answering his arrest record question anyway? He wasn't arrested for that reason. Well, he was put in the back of the parole car if he didn't become, he was handcuffed and put in the back of the parole car. Even the cases that Government cites in our answering brief and Mr. Donica cites in his reply brief make clear that the ability to stop individuals and to detain them briefly under Tarian's project. I'm not talking about that. I'm talking about when he asked him the question, have you been arrested before, and he doesn't answer it. Why does that generate the ability to essentially arrest him? Were they not arresting him when they put him in the car, when they said I'm going to put you in the back of my parole car  There was never any argument by the defense below or in any of the papers that he was arrested at that time, and I don't believe the law would support that. His answer, he tells Mr. Hernandez on the sidewalk there, he's still got to talk to the other two knuckleheads, I think he calls them, the two other subjects, and find out what happened. And because he's essentially not getting anywhere in terms of his investigation of the reported fight, he's asking the question, why does this man have an obligation to answer the question of whether he'd ever been arrested before? I don't know that he has an obligation to do so, but that provided the officer with concern, as he testified, that this Mr. Hernandez who set up a red flag in his mind, that this is a subject who is potentially hiding something on his person, either a weapon or drugs, or might have a warrant, and that's why he's insistently asking the question. All of which might matter if he had some obligation, if the police had a reason to keep him there, in which case they would still let you know if he had a gun. But why did they have a right to keep him there? Well, I think the answer is, to return to the case law I was about to get into, the case law under Terry and its progeny make clear, it's not just criminal suspects. Police officers have the ability to detain. They can detain people momentarily, even witnesses. They can detain them or they can ask them to talk to them. They can stop them and ask them questions. The only case I saw like that was this place where they were stopping everybody briefly, but it appeared that they were only stopping them to ask them, and if anybody had said, I want to go, they could go. That was the Illinois v. Lidster case. But there are other cases we cite. The Williams case, I believe, was Williamson, Walker, Holland, where there's a lengthier detention in one case at gunpoint, where an officer is in the neighborhood where he hears weapons being fired and stops a car, I believe at gunpoint, if memory serves. He doesn't know, the case law, the opinion stipulates, he doesn't know if they're potential witnesses or a suspect. It turns out to be the suspects. But in that case, I think it was the Holland decision, they held that that was an appropriate detention, again, for a brief period of time, a limited period of time. There's one thing between a brief period of questioning to saying, okay, we're going to cuff you and put you back in the squad car. I mean, obviously it's fact-intensive, but he was detained a little longer. He was placed under arrest six minutes after he got off the bus, so it was at most a six-minute encounter, and Mr. Tanaka concedes in his reply brief the first minute and a half or so, I think he said. All right. What was he arrested for? For what reason was he ultimately handcuffed, told to put his hands in the car, handcuffed? And I understand eventually they found the gun, but when it started, what were they doing? Deputy Mueller asked him, does he have anything on him he's not supposed to have? He got no answer. Also, they noticed at the same time. Didn't he tell him he had the gun? Not at that time. Well, why did they have the right to ask him that as opposed to let him go home? Pardon me? Why did they have the right to keep him there as opposed to let him go home at that point? The same reasons I've mentioned. They had they tested that. So your brief stopping of some uninvolved person, which is a non-criminal person, includes the right to make them answer questions about what their arrest record is and what they have on them and so on, rather than any questions about what actually happened, because nobody was asking them questions about what actually happened. They did ask that question. It wasn't answered. And then he then immediately the deputy went, have you ever been arrested before? And that's when it was not answered for several times. And why did he have an obligation to answer that question? I don't know that he has an obligation to answer any questions. But the justification that they testified to. But they threatened him and said if you don't answer the question, we're going to put you in a police car. They have the ability under Terry and its progeny to detain witnesses for, I forget the phrase, a momentary period of time to maintain the status quo so that they can contact other potential witnesses in the area. And they testified that for purposes of detaining someone in a police car. So your ultimate position is that if there's a crime, the police can come, they can take everybody who's in the vicinity and put them in a police car and handcuff them. Not anybody. Why not? Not anybody. Anybody who could have seen it. This is an individual who was reported, whether he was a victim or not, he was reported to have been involved in the altercation. It's not just anybody. And, you know, there are also other facts. He appeared to be under the influence of both officers. The bus driver also offered his opinion on the videotape. You can see it in his eyes with his dilated pupils or something. So he appeared to be under the influence. He wasn't answering basic questions for his I.D. initially. Although he was able to quickly answer questions, how old are you? That he had. But not that long. Why didn't they ask any questions about what had happened? They asked one. But why didn't they keep saying that they had to investigate? The one officer in particular who seemed to be questioning Hernandez, he kept saying it was an investigation, but that's not what they were doing. They never really – they did initiate an investigation. And that's an important question. They did ask the question, what's going on? You want to tell me what's going on? You know, what's up with the other guys? I'm going to ask them the same questions. Those are on Exhibit 1 and part of the declarations as well. So they didn't ask further questions because they didn't get anywhere ultimately. I think I'm out of time, but I did want to just briefly note one thing, if I might, on the search consent waiver argument. There is one case I found. It's actually referenced in one of Mr. Tanaka's cases, the Sanders case, California Supreme Court case, cites to and actually distinguishes a Virginia Court of Appeal case, which was a year later affirmed by the Virginia Supreme Court. The case site is – Why don't you – Is it a 28-J letter perhaps? But we're in California. We're not in Virginia. Yeah. That's another point. The California case law, it's not interpreting – it's not interpreting some sort of state regulatory – But Cesar's opinion seems to regard it as dispositive. The Cesar's decision – all of those cases deal with the parole search document, type of special needs search. It does not address the issue of standing or waiver or consent. And I would note, it's an important distinction because in footnote 3 of Sanders, the California Supreme Court case, they distinguish the Virginia case I just told you about, Anderson v. Poneman. But just to stop you, because you're citing a new case, just give the citation to the clerk and we will take it up. Okay. Fair enough. Thanks for your argument. Thank you very much. I realize we didn't have time to get to all of your arguments you wanted to make today, but they're well presented in your brief. Including your favorite argument, but we won't ignore it. Just one quick factual point, just bolstering, showing that the police had no reasonable belief, or any belief I believe, that this Mr. Nance was anything but the victim. The initial dispatch that Mr. Keenan just referred to did say that there was a verbal fight, but it also mentioned that two people threatened another passenger. So that was the extent of the knowledge they were going in on. So two people threatening another passenger, clearly another passenger was Mr. Nance. Clearly it wasn't the two people threatening. There was no reasonable belief that this was some kind of mutual fight that they had to sort out. It was clear from the outset, and there was absolutely no evidence to the contrary, that this was the same thing, but these two guys picking on Mr. Nance. Okay. Thank you for your arguments. Sorry the law students didn't stick around for this interesting law school type of problem. And a very interesting case, and it will be submitted for decision. We'll be in recess for the morning. Thank you. All right.
judges: Thomas, Wardlaw, Berzon